[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 444 
There is no conflict in the evidence as to the condition of things which prevented the train in which the plaintiff was a passenger from getting into the defendant's station at Boston on the night of the 2nd of January, 1904. The weather was extremely cold — the temperature ranging from six degrees Fahrenheit to zero — and the wind was blowing hard and a heavy snow storm prevailed, of such proportions as to be ordinarily denominated in America a blizzard. The snow fell to the depth of almost a foot on the level and was blown in the railroad yard into drifts three and five feet high. This drifting snow accumulated in the switches, packing in and around the points and other movable parts so that the switches could not be operated from the signal tower until the snow was removed. According to one of the witnesses the high wind forming snowdrifts over the switches put everything in the yard "out of commission" about six o'clock in the evening, inasmuch as the entire force *Page 446 
of men available for the service of the defendant was unable to dig the switches out so as to operate outgoing and incoming trains. As soon as the storm commenced the railroad company hired extra men in addition to twenty-nine men regularly employed in the yard. One hundred and eighty-nine extra men were thus employed in sweeping out the switches by digging around the movable frogs with brooms and shovels. They worked all night and yet it was found impracticable to move any trains in the South Terminal Station of the defendant between about six o'clock on the evening of January 2nd, and about six o'clock on the morning of January 3rd, 1904. During this period about ninety-five trains were scheduled to enter and leave the station. No train due after six o'clock was able to get in.
It was further proved that a storm of such a character as has been described is unusual in Boston and that all the switches on the defendant's track were in perfect condition and capable of being operated perfectly if they had not been obstructed by snow and ice. There is some discrepancy as to the precise point where the train from Quincy was stalled — some of the witnesses stating that it was six hundred or seven hundred feet outside the railroad yard and others that it was at or near the Dover street station, about a mile distant. However that may be, there is no doubt that the train was blocked by the blizzard. Nor can there be any doubt on this record that the defendant railway corporation through its servants and agents made strenuous efforts during the night to clear away the obstructions so as to permit the entrance of this train and all other incoming trains into the station. These efforts, as has been seen, were not successful until the next morning.
The chief question with which we have to deal in the present case is the effect of an act of God or inevitable accident to relieve a common carrier from his obligation to carry passengers promptly. The defendant pleaded the Boston blizzard of January 2, 1904, as its excuse for delaying the arrival of the plaintiff from 8:55 o'clock in the evening until 6 o'clock the next morning. It denominates the blizzard an *Page 447 
act of God. This phrase has been variously interpreted. Lord MANSFIELD considered an act of God to be "something in opposition to the act of man" and its meaning is most frequently illustrated by reference to lightning and tempests. (Forward v. Pittard,
1 T.R. 27.) Some text writers and judges have deemed the phrase synonymous with inevitable accident while others insist that the terms are not convertible. (See Wharton on Negligence, § 553;McArthur v. Sears, 21 Wend. 190; Merritt v. Earle,29 N.Y. 115.) There is an extreme subtlety in some of the suggestions in support of a differentiation, as in Blythe v.Denver Rio Grande R. Co. (15 Colo. 333) where it is insisted that there is a legal distinction between an inevitable accident and an act of God. In that case a gale of wind blew a railroad train from the track and overturned a stove or lamp in one of the cars, which set fire to a package of gold and silver watches belonging to the plaintiff. The court said that the immediate resulting cause producing the loss was the fire which might properly be termed an inevitable accident growing out of the former disaster; while the direct cause of the agency that worked the destruction was the gale of wind which was an act of God putting the agent at work. Whether, however, the terms "act of God" and "inevitable accident" are convertible or not, the snow storm which obstructed the defendant's train in the present case was clearly an act of God within the meaning of that phrase in the rule of law which has made it most familiar; that is, the rule that a common carrier of goods is an insurer against all risks except those caused by the act of God or the public enemy. The act of God is most frequently interposed as a defense in suits seeking to charge common carriers with the partial or total loss of goods; and in such cases the following natural causes among others have been held to be acts of God: Heavy snow storms, unprecedented or unusual and extraordinary freshets or floods, severe wind storms, washouts and earthquakes.
The cases are numerous in which a snow storm has been held to be an act of God which will relieve a common carrier *Page 448 
of goods. It will suffice to refer to a few of the typical decisions to this effect.
In Black v. Chicago, Burl. Quincy R. Co. (30 Neb. 197) the witnesses characterized the snow storm as a blizzard, and an unprecedented snow storm of such violence as to obstruct the movement of trains was declared to fall within the term "act of God." It was further said that while common carriers are not insurers against loss occasioned by an act of God, they are required, upon the intervention of an act of God, to exercise ordinary and reasonable care and diligence to protect the property which they have undertaken to transport against any loss or damage.
In Feinberg v. D., L. W.R.R. Co. (52 N.J. Law, 451) the great blizzard of March 12, 1888, was held to be "undoubtedly the act of God" or an inevitable accident not anticipated or within the control of the railroad company.
In Ballentine v. North Missouri R.R. Co. (40 Mo. 491) it was held that a carrier is not liable for negligence if he be prevented from performing his duty by an act of God, and that a snow storm which blocks up a railroad to such an extent as to hinder and delay the running of cars is such an act.
In Pruitt v. Hannibal St. Joseph R.R. Co. (62 Mo. 527), which was an action for damages alleged to have been occasioned by the defendant's negligence and breach of contract as a common carrier, the principal defense relied upon to excuse the failure promptly to transport the plaintiff's property was the occurrence of a remarkable and unprecedented snow storm which stopped the trains from ten to fifteen days. The court expressed the opinion that a violent snow storm or excessively cold weather could hardly be regarded as an extraordinary event in the latitude of the defendant's railroad in North Missouri during the months of December and January, but nevertheless held that such storms when of sufficient violence or duration to obstruct the passage of trains must be allowed to excuse delays so long as the obstructions continued.
In Cunningham v. Wabash R.R. Co. (79 Mo. App. 524) the delay of the carrier was sought to be excused by reason *Page 449 
of the intervention of an act of God "in that a sudden snow storm occurred about as the shipment began and continued with violence that night so as to impede the travel of the train, thus causing the delay." This defense was amply supported by testimony which was held to be sufficient in point of law to excuse the defendant for the delay in transportation.
In Jones v. Minneapolis St. Louis R.R. Co. (91 Minn. 229) the plaintiff had delivered to the defendant a lot of cattle for transportation on a freight train, but before the freight train reached its destination it was caught in a blizzard and became snow-bound so that the cattle froze to death. The Supreme Court of Minnesota held that the loss was due proximately to the storm, which was an act of God; and that when the intervention of such an overpowering cause was established the burden was upon the opposite party to show that the negligence of the carrier had in some manner concurred in or contributed to the loss.
The foregoing cases relate to acts of God in their effect upon the liability of carriers of goods. We are concerned here, however, not with the destruction of property but with the delay of a passenger. Even in respect to goods, a common carrier is not an insurer as to time. While he is responsible for the safety and final delivery thereof and the general rule is that nothing can exonerate him from that responsibility but the act of God or the public enemy, he is responsible only for the exercise of due diligence in regard to the time of delivery. (Parsons v.Hardy, 14 Wend. 215.) So in respect to passengers, a common carrier is not an insurer as to the time when passengers will reach their destination, in the absence of an express contract on the subject. (Gordon v. M. L. Railroad, 52 N.H. 596, 599, and cases therein cited.) If a railroad company negligently fails to keep the time it promises, it will be liable in damages for injury thereby accruing to a passenger. "But to entitle the plaintiff to recover there must be proof of negligence. Neither time table nor advertisement is a warranty of punctuality." (Wharton on Negligence, § 662.) A railroad company which receives a person upon a train as a passenger *Page 450 
to a specified destination is bound to carry the person to that destination with all reasonable diligence. (Weed v. PanamaR.R. Co., 17 N.Y. 362.) As was said by the Supreme Court of New Hampshire in Gordon v. Railroad (supra): "By the common law, common carriers of passengers are bound to use due care and skill to transport passengers safely and promptly; but they are not insurers of results; they are not held liable as absolute warrantors of safety or speed. * * * The importance of punctuality is undeniable but so is the importance of safety. The serious results of failure in either respect may be weighed in determining whether the carriers have used due care and skill; but the importance of success does not furnish conclusive evidence that the company have absolutely guaranteed against failure."
In the case at bar the time table of the defendant was not put in evidence, but the complaint alleges and the answer does not deny that the train upon which the plaintiff took passage at Quincy was due in Boston at about 8:55 o'clock the same evening. We may assume that this was the advertised hour of arrival appearing in the defendant's time table. Such publication imposes upon the railroad company the obligation to exercise all reasonable care and diligence to make the movements of its trains correspond thereto; but the obligation is not absolute and unconditional. The carrier may be relieved therefrom, if without any negligence on its part the observance of punctuality is prevented by the act of God or inevitable accident. It is the duty of the carrier to exercise reasonable foresight in the anticipation of obstructions to travel; to use all available means for the removal of such obstructions, and to proceed with the transportation as soon as practicable after such removal. (Bowman v. Teall, 23 Wend. 306.) Where all this has been done, the intervention of an act of God or vis major exonerates the carrier from legal liability for the delay.
A case in point is Compton v. Long Island R.R. Co. (1 N YS.R. 554), decided by the General Term of the second department, when Chief Judge CULLEN was a member of that *Page 451 
court. That was an action to recover damages for the failure of the defendant to transport the plaintiff from Belview station to Flatbush avenue. In reference to the liability of the defendant the General Term said: "The plaintiff had no just cause of action against the defendant in the first instance, as the train which he expected to take was delayed by a washout, which was only discovered that morning, over which it would be dangerous, if not impossible, to pass a train of cars, and it was repaired with promptness. Common carriers cannot be held responsible for delays caused by storms and tempests without the intervention of human agency."
If we apply the rule thus stated to the facts of the present case it is decisive of this appeal. The snow storm which delayed the train in which the plaintiff was a passenger must, under all the authorities, be classed as an act of God. Proof of its occurrence and effect constituted a complete defense to the plaintiff's claim so far as it was based merely on the delay which he sustained. So far as he complained of the dark, cold and uncomfortable condition of the car in which he says he was compelled to spend the night, and the failure of the defendant to mitigate such condition, there was a conflict of evidence on that issue, and the plaintiff would have been entitled to go to the jury if that part of the case had been submitted separately. The charge, however, left the jury at liberty to hold the defendant liable for the delay due to the blizzard, even if they should find that the railroad company had done all that it could reasonably be required to do in the way of ameliorating the plaintiff's surroundings during the period of detention. Under these circumstances justice obviously requires a reversal of the judgment. The defendant's exception was well taken to that portion of the charge which left it to the jury to say whether the storm rendered it impossible for the railroad company to transport the plaintiff to his destination on that evening. The evidence was not such as to permit a negative answer to that question. It was all the other way.
The sole defense in this case is the occurrence of a snow *Page 452 
storm of such severity as to amount to an act of God, and, therefore, I have considered that alone; but I do not wish to be understood as implying that it is only such an event that can constitute a valid excuse in law for the failure of a common carrier to convey passengers promptly. I think that there may be circumstances under which an inevitable accident due solely to human agency, and in no proper sense an act of God, will serve to exonerate the carrier. Suppose, for example, that the train in which the plaintiff was traveling had been stopped all night by the wreck of another train on the same railroad, which wreck was not attributable to any negligence whatever on the part of any one. Such a thing may not be a common occurrence, but it is by no means inconceivable. In the case supposed, the railroad wreck could not be considered an act of God, and yet the resulting obstruction to the movement of other trains ought to exonerate the railroad company from responsibility for their delay in arriving at their respective destinations.
For the reasons which have been given I advise that the judgments be reversed and a new trial ordered, with costs to abide the event.
CULLEN, Ch. J., EDWARD T. BARTLETT, HAIGHT, VANN, HISCOCK and CHASE, JJ., concur.
Judgments reversed, etc.