Nana Serwaa DONKOR, Plaintiff,

v.

BRITISH AIRWAYS, CORP. and VLJ Travel Service, Defendants.

Civ. A. No. 97–CV–3949(DGT).

United States District Court, E.D. New York.

Aug. 12, 1999.

Kamal Rostogi, New York, NY, for Nana Serwaa Donkor, Plaintiff.

Stephen J. Fearon, James G. Hnat, Richard B. Marrin, Condon & Forsyth, LLP, New York, NY, for British Airways, Defendants.

Jason Paris, Law Office of Mark Sietelman, New York, NY, For VLJ Travel Service, Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

Plaintiff, Nana Serwaa Donkor ("Donkor"), brought an action in New York State Civil Court, County of Queens alleging that defendants, British Airways, Corp. ("British Airways"), and VLJ Travel Service ("VLJ"), bore liability under theories of tort and contract for the harms Donkor suffered as a result of her having been detained and deported by the British Immigration Office during an unexpectedly

long layover in England while she was flying from the United States to France. British Airways removed the case to federal court and now moves that its case be severed from VLJ's. Defendants have also jointly moved for summary judgment on Donkor's claims. Although none of the parties disputed jurisdiction, the court raised the issue *sua sponte*. Because the parties have not established that there was a basis for removal, the action is remanded.

## Background

On May 23, 1997, Donkor, a citizen of Ghana traveling on a passport from Ghana, purchased a round trip ticket from VLJ for a flight on British Airways from John F. Kennedy airport in New York to Charles De Gaulle Airport in Paris, France. The ticket required that Donkor land at the Birmingham, U.K. airport in order to connect with another British Airways flight making the last leg of the flight to France. Donkor alleges that she was told by VLJ that she would not need a transit visa in order to make the connection which was to leave Birmingham airport "shortly" after Donkor's arrival. Pl. Mem. at 2. *See* Ans. to Inter. at ¶ 5, R.56.1, Ex. B ("Ans. to Inter.").

The flight from JFK was scheduled to arrive at Birmingham at 9:50 A.M. on June 8, 1997. Because of passenger illness, however, the pilot of that flight was forced to land the plane in Gander, Newfoundland, thereby delaying Donkor's flight by nearly seventeen hours and causing her to miss her connection to Paris, France. Upon arrival at Birmingham airport, Donkor was held by British Immigration and then deported. Donkor blames British Airways for the damages she suffered. There was no representative from the airline upon Donkor's arrival, and Donkor was given no assistance. Specifically, Donkor alleges that she was "never escorted nor advised by British Airways staff to go to the Transit Lounge. Rather, both my baggage and myself were ushered before the Immigration Official instead of being routed to Paris." Donkor Aff. at ¶ 7. She asserts that she was "abandoned" by British Airways and "left [at] the mercy of Immigration." Donkor Aff. at ¶ 10; Ans. to Inter. at ¶ 6. British Immigration officials then refused Donkor admission into the United Kingdom because she did not have the proper visa. They prevented her from transferring to a flight to Paris, detained her for seven hours, confiscated 486 items of clothing which were determined by British immigration officials to be "counterfeit," *see* British Customs Form, Ans. to Inter., Ex B, and deported her to the United States on board another British Airways flight.

## Discussion

### (1)

Plaintiff characterizes her claim as one "based in negligence, breach of contract, personal injury, wrongful detention, assault and loss of personal belongings." Def. Mem. at 1. Her original complaint asserted that:

> the defendants represented that NO [sic] transit visas were required to land in Birmingham, UK [sic]. However, plaintiff was detained for (7) hrs and deported back to the USA [sic] without accomplishing her purp[o]se, resulting in loss of her belongings in the amount of $5,000, psychological injury, put into detention, and assaulted, demeaned, and confined/detained by the UK [sic] authorities as a result of the defendan[t]s' failure to advise plaintiff to obtain a transit visa. WHEREFORE, plaintiff demands judgment for plaintiff in the sum of $25,000.00 with cost and attorneys fees.

Endorsed Complaint.

In response to an interrogatory, Donkor asserted that British Airways' negligence was constituted in part by the facts that Donkor "was not properly advised for the next flight and was left on [sic] the mercy of [the] Immigration Officer." Ans. to Inter. at ¶ 6.

Donkor originally brought this action against British Airways and VLJ in the New York State Civil Court. Donkor did not assert a federal cause of action in her complaint. Nevertheless, British Airways subsequently removed the action to the Federal District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1331 (federal question jurisdiction) on the ground that plaintiff's claims arose out of international transportation and were, therefore, governed by the provisions of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, App. 49 U.S.C. § 40105 ("the Warsaw Convention" or "the Convention"). Interestingly, despite the fact that British Airways removed the action to federal court on the ground that the claims were governed by the Warsaw Convention, it then proceeded to ignore the federal basis for removal it had asserted, and moved for summary judgment entirely on the alleged preemption of Donkor's state law claims by the Airline Deregulation Act of 1978.

Beyond the bald assertion by defendant British Airways that federal subject matter jurisdiction may be found in the Warsaw Convention, neither party discussed federal subject matter jurisdiction until requested to do so. *See* Memo from Court, dated 5/13/99. In a memorandum from the court, the parties were requested to answer the following pertinent questions: which of plaintiff's claims were preempted by the substantive scope of the Warsaw Convention and which were not? *See* Memo dated 5/13/99. The parties did not significantly clarify the issues in response to that memo. Oral argument was heard on the motion on July 15, 1999. At that point, in response to the court's questions involving its jurisdiction to hear the matter, British Airways requested that they be allowed to further brief the matter.

The parties were granted additional time in which to supplement the record with letter briefs. However, as shall become evident, the grant of additional time did not result in further clarification of the issues.

(2)

■ Under the Warsaw Convention, a court must have both "treaty" and "domestic" jurisdiction. *See Smith v. Canadian Pac. Airways, Ltd.*, 452 F.2d 798, 799–800 (2d Cir.1971); *Malik v. Butta*, No. 92 CIV 8703, 1993 WL 410168, at *3 (S.D.N.Y. Oct.14, 1993). Treaty jurisdiction is governed by Article 28 of the Convention which supplies four fora in which suit may be brought based on where tickets were bought, who the parties are, and what travel was contemplated.[1] Domestic jurisdiction refers to the rules of the forum's courts.

■ In this case, because the ticket was bought within the United States and contemplated a round trip beginning and ending in the United States, the requirements of treaty jurisdiction are clearly fulfilled. *See* Arts. 1(2), 28(1). Whether the requirements of domestic jurisdiction are satisfied, however, is a more complicated question.

■ A case brought in state court may be removed by the defendant to federal court if the case originally could have been brought in federal court pursuant to 28 U.S.C. § 1331 because a federal question was presented on the face of the complaint. *See* 28 U.S.C. § 1441. Furthermore, even if there is no federal cause of action presented on the face of the complaint, a defendant may still remove a cause of action to federal court if the state claims are completely preempted by a federal statute. *See Caterpillar, Inc. v.*

1. Article 28(1) of the Convention reads:
An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carri- er or of his principal place of business through which the contract has been made, or before the court at the place of destination.

*Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987); *Fax Telecommunicaciones, Inc. v. AT & T,* 138 F.3d 479, 486 (2d Cir.1998); 14B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* §§ 3722, 3722.1 ("Wright & Miller"). The common presumption is that a federal court lacks subject matter jurisdiction until that jurisdiction is established. *See Benjamins v. British European Airways,* 572 F.2d 913, 915 (2d Cir.1978) (plaintiff asserting jurisdiction under the Warsaw Convention must establish that case is covered by the convention); *United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, at § 3522. If a district court finds that it does not have subject matter jurisdiction over a case, it must remand that case to state court. *See* 28 U.S.C. § 1447(c).

■ Although it is now generally accepted that the Warsaw Convention creates its own cause of action, *see Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir.1978) (ruling that Articles 17 and 18 of the Warsaw Convention—personal injury and loss of baggage—do create a cause of action for wrongful death and loss of baggage), Donkor did not mention the Warsaw Convention on the face of her complaint. Thus, removal could only have been proper if the Warsaw Convention completely preempted all state law claims—a conclusion defendants originally attempted to reach via the assertion that the claim arose out of international travel. In the letter replying to the court's request for further discussion of the preemption issue, defendants stated:

> Article 24 of the Convention provides that actions for damages, however founded, can only be brought subject to the conditions and limitations set forth in the Convention. Article 24 precludes a passenger from asserting claims based on local law and, consequently, [Donkor's tort claims] may not be properly asserted in a case governed by the Warsaw Convention. *El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. [155], 119 S.Ct. 662[, 142 L.Ed.2d 576] (1998).

British Airways Letter, dated 6/9/99. However, while defendants are correct in their assertion that the Warsaw Convention completely preempts the claims that it governs, they are incorrect to imply that the Convention governs all claims arising out of international transportation.

The Second Circuit has stated that the Warsaw Convention's provisions preempt "[a]ll state law claims that fall within the scope of the Convention." *Fishman v. Delta Air Lines, Inc.,* 132 F.3d 138, 141 (2d Cir.1998). Chapter I of the convention, entitled "Scope—Definitions," reads:

> This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.

Art. 1(1). Defendants contend that, because Donkor's travel between the United States and France fits this definition, *see* Art. 1(2), the Convention applies to her claims and creates jurisdiction. Cases which have addressed the question of the Convention's preemptive scope, however, have understood that scope to be less expansive than "all international transportation." For instance, the Second Circuit has noted that: "the Convention does not apply to all claims of injuries suffered in conjunction with international air travel." *Pflug v. Egyptair Corp.,* 961 F.2d 26, 28 (2d Cir.1992). Instead, in analyzing the question of preemption, the Court of Appeals has assessed whether or not the claims fell within the three possible types of carrier liability created by the Convention: personal injury caused by an accident which occurs between the times the passenger embarks and disembarks an airplane, damage to or loss of luggage during the transport by air, and "damage occa-

sioned by delay in the transportation by air of passengers, baggage, or goods." Arts. 17, 18, 19 (quoted language). *See, e.g., Fishman,* 132 F.3d at 141; *Pflug,* 961 F.2d at 28.

Significantly, in its latest decision on the Convention, *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999), the Supreme Court specifically recognized that the Convention preempts only those causes of action covered by its liability Articles. There, in a case in which the Supreme Court overruled the Second Circuit and made it clear that the Convention supplies the exclusive remedy for damages based on claims governed by its damages articles, the Court also stated:

> The Second Circuit feared that if Article 17 were read to exclude relief outside the Convention for [plaintiff], then a passenger injured by a malfunctioning escalator in the airline's terminal would have no recourse against the airline, even if the airline recklessly disregarded its duty to keep the escalator in proper repair.... As the United States pointed out in its amicus curiae submission, however, the Convention addresses and concerns, only and exclusively, the airline's liability for passenger injuries occurring "on board the aircraft or in the course of any of the operations of embarking or disembarking." Art. 17, 49 Stat. 3018; *see* Brief for United States as Amicus Curiae 16. "[T]he Convention's preemptive effect on local law extends no further than the Convention's own substantive scope." Brief for United States as Amicus Curiae 16. *A carrier, therefore, "is indisputably subject to liability under local law for injuries arising outside of that scope:* e.g., for passenger injuries occurring before 'any of the operations of embarking or disembarking.' " *Ibid.* (quoting Article 17).

*Id.* at 673 (emphasis added). It might also be noted, that the government's brief, quoted by the Court for its understanding of preemption, interpreted the liability articles of the convention as limiting the term "international air travel" as set forth in Art. 1(1). *See* Brief for United States as Amicus Curiae, *El Al,* 1998 WL 401592, at *15–16 (addressing effect of Art. 17). Therefore, although *El Al* concluded that the "Warsaw Convention precludes a passenger from maintaining an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention," *El Al,* 119 S.Ct. at 675, it is clear that the Court was contemplating only those claims falling within the Convention's scope. *See id.* at 675–76 (Stevens, J. dissenting on different grounds) ("Article 24 preempts local law in three major categories: [damages covered by Articles 17, 18, and 19]").

Thus, despite defendants' original contention that Articles 1(1) and 24 establish an automatic basis for removal, defendants must actually establish that plaintiff's causes of action are governed by Articles 17, 18, or 19 in order to support preemption and, thus, provide a basis for removal. In other words, defendants must provide evidence that the damage suffered by plaintiff is rooted in a cause which the drafters of the Convention intended to address. None of the parties originally addressed this issue; nor has any party alleged facts sufficient to sustain jurisdiction under this test.

The majority of cases that have dealt with claims brought under the Convention have been based on the first possible cause of action: personal injury under Article 17. Article 17 provides the exclusive remedy for allegations of personal injury stemming from events which occur on board an aircraft or while the plaintiff is embarking or disembarking from the flight. *See* Art. 17; *see also El Al,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576. Whether a plaintiff is found to have been embarking or disembarking so as to be covered under Article 17 is a fact specific question generally evaluated under a three part test: (1) the plaintiff's activity at the time of the accident causing the injury; (2) the plaintiff's

location; and (3) whether or not the plaintiff was under the control of the carrier. *See Day v. Trans World Airlines,* 528 F.2d 31, 33 (2d Cir.1975).

In the case at bar, the pertinent question is whether plaintiff's alleged injuries occurred after disembarkation. Presumably, the accident invoking Article 17 would be Donkor's abandonment by British Airways which either caused or exacerbated her predicament in Great Britain. Neither Donkor nor British Airways has made a representation as to where Donkor was when she was "abandoned," what she was doing at the time, or whether she was acting on her own accord or was still under the control of the airline. At oral argument, Donkor's counsel represented that Donkor was attempting to enter Birmingham because of the long delay in travel which she faced. This single piece of information, not in legally admissible form, would seem to indicate that Donkor had completed disembarking and, therefore, that Article 17 is inapplicable.[2] In any case, the burden is on the party or parties seeking to establish coverage by the convention; no evidence is the equivalent of negative evidence. Thus, Donkor cannot be found to have been within the reach of Article 17 of the Convention.[3]

The claims created by Articles 18 and 19 are less frequently utilized and, therefore, more open to interpretation. Furthermore, their enabling language is much broader.

Article 18, covering loss of baggage, deserves short shrift in the present case. The only damage to baggage alleged by Donkor concerns her loss of nearly 500 pieces of clothing which were determined by British Immigration to be "counterfeit" and, thus, were confiscated. *See Ans.* to Inter. Ex. B.[4] Article 18, however, only extends to damages which take "place during the transportation by air, [which comprises] the period during which the baggage or goods are in charge of the carrier." Art. 18. Clearly, when the goods are examined by immigration, they are not in the charge of the carrier. Thus, Donkor's claims do not present an Article 18 cause of action. Therefore, Article 18 cannot supply the basis for removal.

The third cause of action created by the Convention is contained within Article 19: "The carrier shall be liable for damages occasioned by delay in the transportation by air of passengers, baggage, or goods." Art. 19. It is on Article 19 that British Airways, on its third try, finally asserted preemption by the Convention. *See* British Airways Letter, dated 7/29/99. Significantly, unlike Article 17, Article 19 has not been interpreted to limit recoverable damages to physical injuries. The majority of

2. For a more in depth discussion of the scope of Article 17's "disembarking" clause, see this court's opinion in *Alleyn v. Port Authority of New York and New Jersey,* 58 F.Supp.2d 15, 18–22 (E.D.N.Y.1999).

3. If Donkor's claims were governed by Article 17, she would be barred from any remedy. A plaintiff may recover under that Article only if: first, the personal injury alleged is a physical harm—neither psychosomatic nor psychic injury is actionable under this provision, *see Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 536–37, 111 S.Ct. 1489, 1494, 113 L.Ed.2d 569 (1991); and second, the injury is the result of an accident. The term accident has been defined broadly as "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks,* 470 U.S. 392, 405, 105 S.Ct. 1338, 1345, 84 L.Ed.2d

289 (1985). Even with the assumption that Donkor's abandonment could be considered an accident under this broad definition, Donkor would not be entitled to any recovery because she has not alleged any physical harms which would allow recovery under Article 17.

4. The record is devoid of any discussion of or explanation for the actions of the British customs agents. Thus, it should be noted that if "counterfeit" described clothes which were illegal in Great Britain but not necessarily in France, possibly because of import regulations, as opposed to clothes that carried false brand indications that would presumably be illegal in both countries, such confiscation might have been occasioned by delay and, thus, form the basis for damages under Article 19 of the Convention. *See infra.*

the cases which have dealt with this provision have discussed it as it relates to "bumping" passengers from over booked flights. The leading case, *Wolgel v. Mexicana Airlines,* 821 F.2d 442 (7th Cir.1987), held that the Convention does not provide a remedy to bumped passengers solely on the basis of their having been bumped. But in *Mahaney v. Air France,* 474 F.Supp. 532 (S.D.N.Y.1979) (cited in *Wolgel,* 821 F.2d at 444), a district court held that Article 19 does govern claims for the damages associated with the delay occasioned by passengers' who had been bumped. Similarly, in *Sassouni v. Olympic Airways,* 769 F.Supp. 537 (S.D.N.Y. 1991), the district court held that a plaintiff, who was bumped from a flight to Tel Aviv, presented a claim governed by Article 19 of the Convention for mental and emotional damages occasioned by his having been forced to travel after sundown on Passover.

In its letter to the court of July 29, 1999, British Airways depends on the conclusory statement that Donkor's complaints "arose out of delay" and, thus, are preempted by Article 19. Donkor does not in fact mention the delay as a source for her injuries, and, without some discussion of the relationship between the delay and Donkor's injuries, British Airways' statements are not convincing. Whether or not Donkor's damages were occasioned by delay is ultimately predicated on whether Donkor would have needed the transit visa had she arrived in the United Kingdom on time. If it were the case that Donkor would not have needed a transit visa had she arrived in Britain on time, the damages Donkor suffered as a result of not having her visa were clearly occasioned by delay. Similarly, if there were steps that British Airways could have taken to avoid the injuries Donkor suffered which would not have been necessary absent the delay—for instance, warnings that, despite the long wait, Donkor had to remain within certain areas of the airport—Donkor's claims against British Airways would be occasioned by a combination of delay and British Airways'

"abandonment" of Donkor. In either situation, her claims would provide grounds for federal jurisdiction. On the other hand, if the transit visa were necessary no matter how short the transit time, and if British Airways were powerless to defray any of Donkor's injuries, Donkor would have suffered the same injuries regardless of the delay, and there would not seem to be a basis for preemption by the Warsaw Convention, or for subject matter jurisdiction in federal court. Neither party has presented any evidence, however, as to what would have occurred if Donkor had arrived at the airport on time, or as to what British Airways could have done to help her upon her arrival.

In the end, because the parties have failed to submit relevant information despite this court's request, the above reasoning is reduced to so much guess work. Defendants have not carried their burden of establishing that Donkor's claims are preempted by the "substantive scope" of the Warsaw convention.

### (3)

In their notice of removal, defendants also asserted that "to the extent that the subject matter of this action relates to the rates, routes, or services of an air carrier, it therefore, is expressly and completely preempted by Section 41713 of the Federal Aviation Administration Authorization Act ["the Federal Aviation Act"]. 49 U.S.C. App. § 41713(b)(1)." Notice of Removal at ¶ 3. Defendants did not assert this preemption as a basis for jurisdiction in response to the court's memo or at oral argument.

The Federal Aviation Act, originally enacted in 1958, was amended in 1978, by the Airline Deregulation Act ("the ADA" or "the Act"), 92 Stat 1705, which "largely deregulated domestic air transport" in order to improve the efficiency of the airline industry by fostering competition. *American Airlines Inc. v. Wolens,* 513 U.S. 219, 222, 115 S.Ct. 817, 821, 130 L.Ed.2d 715

(1995). *See Abdu–Brisson v. Delta Air Lines,* 128 F.3d 77, 80 (2d Cir.1997). "To ensure that the States would not undo federal deregulation with regulation of their own," the Airline Deregulation Act included a preemption clause. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378, 112 S.Ct. 2031, 2034, 119 L.Ed.2d 157 (1992). *See* 49 U.S.C. § 41713(b)(1).

While claims that relate to rates, routes, or services are preempted by the Airline Deregulation Act, it does not seem that preempted claims are "completely preempted." In other words, preemption by the Act does not seem to create federal jurisdiction. Although the issue does not appear to have been addressed within the Second Circuit, other courts have declined to find complete preemption. *See, e.g., Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1252 (6th Cir. 1996) (ruling Airline Deregulation Act does not completely preempt state law); *Sam L. Majors Jewelers v. ABX, Inc.,* 117 F.3d 922, 925 (5th Cir.1997) (same). Indeed, the Supreme Court has remarked in dicta related to the preemption of contract claims that the Act was not intended to "channel actions into federal court." *American Airlines v. Wolens,* 513 U.S. 219, 230, 115 S.Ct. 817, 825, 130 L.Ed.2d 715 (1995). In the face of such authority it seems clear that preemption by the Airline Deregulation Act cannot, by itself, provide grounds for removal to federal court.

Alternatively, even if the Act did provide a basis of jurisdiction for the claims which fell under its preemptive umbrella, Donkor's claims do not "relate to the rates, routes, or services of an air carrier" under the interpretation that language has been given by the Second Circuit and other district courts. Therefore, the Airline Deregulation Act, never explicitly presented as the basis for removal in the present case, could not, in fact, have provided grounds for removal.

■ Donkor asserts various claims in tort and contract against British Airways. She alleges that British Airways breached its contract by failing to warn her of the need for a visa and by failing to safely deliver her to France. Donkor further asserts that British Airways was also negligent when it failed to warn her that she needed a transit visa, when it "abandoned" her in England, and when it appointed "a[n] incompetent and careless person as [its] agent." Ans. to Inter. at ¶ 6.

■ Breach of contract claims are not preempted by the Airline Deregulation Act. *See American Airlines, Inc. v. Wolens,* 513 U.S. 219, 232, 115 S.Ct. 817, 826, 130 L.Ed.2d 715 (1995); *Galbut v. American Airlines, Inc.,* 27 F.Supp.2d 146, 151 (E.D.N.Y.1997) (citing cases); *Chukwu v. Board of Dir. Varig Airline,* 880 F.Supp. 891, 895 (D.Mass.1995). Tort and statutory claims may be preempted in some situations. The Second Circuit addressed preemption by the Act in *Abdu–Brisson.* There, the court held that, in a case brought by airplane pilots against their employer, the Act would not preempt state laws against age discrimination. The Court of Appeals wrote that the Airline Deregulation Act, enacted in order to deregulate the industry, was "based on a Congressional assumption that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality ... of air transportation services.' " *Id.* at 84 (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378, 112 S.Ct. 2031, 2033, 119 L.Ed.2d 157 (1992)). The Second Circuit held that the enforcement of age discrimination laws was not contrary to these purposes, only had a tenuous effect on service, and did not directly affect price because airlines do not set their prices on a "cost-plus" basis. *Id.* at 84–85. Therefore, the Court of Appeals held, preemption was not appropriate. The court further concluded that the Act's preemption clause creates an illusory test, and that: "[o]ur only recourse is to apply the ADA preemption as we understand its meaning on a case-by-case basis." *Id.* at 85–86.

A district court case, *Rombom v. United Air Lines, Inc.*, 867 F.Supp. 214 (S.D.N.Y. 1994), had previously provided an organized structure for addressing the preemption question on a case by case basis as it relates to laws which affect services.[5] In *Rombom*, a passenger who had allegedly acted in a rambunctious manner during take off, disturbed the attendant during her safety presentation, and was, thus, put off the plane, sought damages on the basis of the way she had been treated by the airline's flight crew and ground security. Rombom alleged that, for no good reason, the flight crew was rude to her, turned the plane around, threw her off the plane, and had her arrested. She sued for a total of eight million dollars. *See id.* at 216–17.

In finding that Rombom's claim was preempted by the Airline Deregulation Act because it related to a service, the district court stated: "Confining the preemption inquiry to the question of whether the tasks implicated in the complaint ... are services under [the Act] is inadequate. *The manner in which an inflight activity is conducted also bears on the question of preemption.*" *Id.* at 221 (emphasis added). The district court then identified three determinative factors for the preemption analysis. First, whether "the activity at issue in the claim is an airline service." *Id.* Second, "whether the claim affects the airline service directly." *Id.* at 222. And third, "whether the underlying tortious conduct was reasonably necessary to the provision of the service." *Id.* Because, the district court concluded, the conduct in question was directly related to the way in which the airline provided services—in this case a flight safe from those who act improperly on a plane—and its behavior was generally necessary to provide those services, the majority of the claims were preempted. Only Rombom's arrest, as to

which there was a separate question of fact, withstood the motion for summary judgment.

Other district court cases have supported the importance of the third prong of the *Rombom* test by acknowledging that when negligence in the provision of a service causes injury, the claim may not be preempted by the Airline Deregulation Act. In *Barbakow v. USAIR*, 950 F.Supp. 1145 (S.D.Fla.1996), the district court held that where a flight attendant had negligently dropped a soft drink on a passenger's foot, the passenger's personal injury claim was not preempted by the Act because it related to the airline's breach of its duty of ordinary care in the performance of services it chose to provide. *See id.* at 1148–49. Similarly, in *Trinidad v. American Airlines*, 932 F.Supp. 521 (S.D.N.Y.1996), the district court held that claims alleging negligence on the part of pilots who flew into turbulent airspace without warning passengers were not preempted by the Act despite the fact that the claims related to the service the airline provided. In all of the above cases it is clear that claims that an airline or its personnel were negligent in the performance of their duties are not preempted by the Act.

Donkor's tort claims assert that British Airways was negligent in the performance of its duties and services when Donkor boarded the plane and when she arrived in England. In relation to the test laid out in *Rombom*, none of the acts which Donkor claims were negligent was necessary for the provision of a service.

Donkor contends that British Airways checked her passport but did not inform her that she needed a transit visa for the flight. It appears that the contract between Donkor and British Airways placed

---

5. *Rombom* has not been cited by the Second Circuit but it is widely cited elsewhere. *See, e.g., Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir.1998); *Lewis v. Continental Airlines, Inc.*, 40 F.Supp.2d 406, 412 (S.D.Tex.1999); *Von Hundertmark v. Boston Prof'l Hockey*

*Ass'n, Inc.*, No. 93–CV–1369, 1996 WL 118538, at \*6 (E.D.N.Y. March 7, 1996); *Chrissafis v. Continental Airlines, Inc.*, 940 F.Supp. 1292, 1299 (N.D.Ill.1996); *Trinidad v. American Airlines, Inc.*, 932 F.Supp. 521, 523 (S.D.N.Y.1996).

the burden of acquiring the correct documentation, and the risks associated with not having acquired the documentation, on Donkor.[6] However, the examination at this point must be of the character of the claims and not of their merit. Donkor's claim that British Airways was negligent in examining her papers and yet letting her board is essentially a claim that British Airways chose to provide a service, but did so negligently. Such a claim is not preempted by the Airline Deregulation Act. Nor can it be said that allowing Donkor to board the plane without the proper visa, if that is actually what occurred, was necessary to the provision of any service. Therefore, while not necessarily viable, the claims based on British Airways' actions in the United States are not preempted by the Airline Deregulation Act.

The claims Donkor bases on her experience upon her arrival in the United Kingdom are also not preempted and, unlike her "boarding claims," evoke more sympathy. Not only would it seem obvious that British Airways did have some duty not to "abandon" Donkor upon her late arrival,[7] it is impossible to imagine that such an abandonment was necessary or related to the provision of any service. Therefore, British Airways' negligence in the United Kingdom also cannot be found to be preempted by the Act.[8]

---

**6.** Donkor alleges that British Airways breached its contract by not arranging for a problem free flight to Paris, France. British Airways has correctly asserted that a valid tariff is the sole contract between an airline and its passengers, *see Tishman & Lipp v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir.1969), and that the British Airways tariff places the burden of obtaining the correct documents for travel on the passenger. This would also seem to refute plaintiff's argument that British Airways had a duty to check for Donkor's documentation such that British Airways could be held liable for negligence when it failed to do so. Donkor asserts, however, that British Airways' tariff is invalid to the extent that it establishes that it is the responsibility of the passengers to have the correct documentation for international travel. Donkor contends that this clause of the tariff has been "preempted by American and British statutes which levy fines against airlines when they transport individuals into the respective countries without the proper documentation." *See* the British Immigration Act of 1987; § 273 of the Immigration and Naturalization Act, 8 U.S.C. § 1323. While it seems that defendants have, by far, the better of this dispute, it is not reached here because of the conclusion that there is no federal jurisdiction.

**7.** "A common carrier such as an airline generally owes its passengers a duty of reasonable care under the circumstances." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998) (interpreting New York law). Furthermore, as the New York Court of Appeals wrote ninety years ago: "A railroad company which receives a person upon a train as a passenger to a specified destination is bound to carry the person to that destination with all reasonable diligence.... [C]ommon carriers of passengers are bound to use due care and skill to transport passengers safely...." *Cormack v. New York, N.H. & H.R. Co.*, 196 N.Y. 442, 449–50, 90 N.E. 56 (1909) (internal quotations omitted). Having agreed to transport Donkor from the United States to France, British Airways had a duty to facilitate that journey if possible, and protect Donkor from preventable injury even if final consummation of the contract was impossible. Having arrived in the United Kingdom 17 hours late, it should have been obvious to British Airways that some extra guidance would be necessary for transiting passengers. Therefore, Donkor's unrebutted allegation that British Airways abandoned her would seem to establish that British Airways breached its duty of reasonable care and, under New York law, might be liable for negligence. Of course, as the federal court is without jurisdiction in this case, that issue is left to the appropriate New York court—in this case, the New York Civil Court, County of Queens. Furthermore, while it might be expected that the law of the United Kingdom would be similar to that of New York on this issue, if it is not, the state court will also face the interesting conflict of laws question as to which law should govern when a citizen of Ghana, residence unknown to the record, purchases a ticket in New York for a flight to France and suffers injury in the United Kingdom.

**8.** In addition to arguing that *Rombom* supports their claim of preemption, defendants cite three other cases in support of their claims: *Galbut v. American Airlines, Inc.*, 27 F.Supp.2d 146 (E.D.N.Y.1997) (finding tort claims based on a dispute over ticket upgrades which resulted in passenger's harassment by airline preempted); *Nazarian v. Compagnie Nat'l Air France*, 989 F.Supp. 504

Nor does the possible cost increase which judicial enforcement of such duties might create provide a basis for preemption. As was noted in *Abdu–Brisson*, any extra cost that would be incurred from requiring the airlines to honor their duties to help a passenger caught in Great Britain because of a delayed flight would not directly affect airline prices, and, therefore, would also not serve as a basis for preemption.

British Airways additionally argues that "any claims that allege British Airways ... was negligent in the operation of its flight schedule are preempted by the ADA." Def. Mem. at 10. And, indeed, this is a strong position. The maintenance of the flight schedule directly affects rates, routes and services. However, the claims in this case are not based on the maintenance of the flight schedule, from which the pilot deviated because of a medical emergency. They are, instead, based on the manner in which the events surrounding the delay were handled.

## Conclusion

The parties have been unable to establish that Donkor's claims are preempted by either the Warsaw Convention or the Airline Deregulation Act. Therefore, as removal was improper, this case is remanded to the New York Civil Court, County of Queens, pursuant to 28 U.S.C. § 1447(c), on the basis of lack of subject matter jurisdiction.

(S.D.N.Y.1998) (finding negligence claim based on flight schedule preempted); and *Trinidad v. American Airlines, Inc.*, 932 F.Supp. 521 (S.D.N.Y.) (finding no preemption of tort claims brought against airline and pilot for personal injuries sustained when plane experienced sudden drop in altitude). None of these cases suggest that Donkor's claims would be preempted. Although *Nazarian* involved, *inter alia*, claims similar to the ones at bar—an Iranian couple on their honeymoon claimed that they been abandoned to the French authorities during an unexpected layover which resulted in their temporary arrest by the authorities—those similar claims were dismissed on a jurisdictional issue involving the Foreign Sovereign Immunities Act. The Airline Deregulation Act was held to preempt only a claim alleging negligence in the maintenance of the flight schedule.